IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES MICHAEL MILLIS, | ) | |
| | ) | |
| Plaintiff, | ) | 20 C 4146 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| AMERITAS LIFE INSURANCE CORP., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

James Millis alleges in this diversity suit that Ameritas Life Insurance Corporation wrongfully denied his claim for total disability coverage, which he based on his inability following a wrist injury to work as a liver transplant surgeon. Doc. 1. The complaint sets forth a breach of contract claim and a claim for the vexatious and unreasonable denial of coverage under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155. *Ibid*. With discovery complete, the parties cross-move for summary judgment on the breach of contract claim, Ameritas moves for summary judgment on the Section 155 claim, and Millis moves to exclude Ameritas's vocational expert. Docs. 45, 50, 62. Millis's summary judgment motion is granted, Ameritas's summary judgment motion is granted as to the Section 155 claim and denied as to the breach of contract claim, and Millis's motion to exclude is denied as moot.

**Background**

Because the parties cross-move for summary judgment on the breach of contract claim—the principal claim in this case—the court ordinarily would view the disputed facts in the light most favorable to Ameritas when considering Millis's motion and in the light most favorable to Millis when considering Ameritas's motion. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for

1

summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted).  But because the court will grant Millis summary judgment on the contract claim, the facts are set forth as favorably to Ameritas as the record and Local Rule 56.1 permit.  *See Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014).  (The court will view the facts through the converse lens when evaluating Ameritas's motion for summary judgment on the Section 155 claim.)  At this juncture, the court must assume the truth of those facts, but does not vouch for them.  *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

### A.    Millis's Medical Practice and Injury

Millis works as a surgeon at the University of Chicago Medicine Center ("UChicago Medicine").  Doc. 47 at ¶ 32.  Millis completed a residency and fellowship in liver transplantation at UCLA School of Medicine to train as a liver transplant surgeon, and he has been certified as a United Network for Organ Sharing primary liver transplant surgeon since 1994 and as a living donor surgeon since 2000.  Doc. 58 at ¶¶ 12-13.  He is also an expert in hepatobiliary surgery.  Doc. 47 at ¶ 35.

In 1994, Millis began working as a Transplant Surgeon in UChicago Medicine's Section of Transplant Surgery, where his role was "predominantly hepatobiliary surgery and liver transplantation." *Id*. at ¶ 40; Doc. 58 at ¶ 14.  He also held a position as Professor of Surgery at UChicago Medicine, in which capacity he trained and taught students and physicians about liver transplants and managing liver disease.  Doc. 47 at ¶¶ 33, 38.  Before his wrist injury, Millis was one of four liver transplant surgeons in the Section of Transplant Surgery, on call fourteen days per month for transplants.  *Id*. at ¶ 55; Doc. 58 at ¶ 25.  In 2017 and 2018, Millis performed twelve and ten liver transplants, respectively, as a primary surgeon.  Doc. 66 at ¶ 72.  During that

2

pre-injury time frame, he also performed liver procurements, complex general surgeries, and about 75 hepatobiliary surgeries per year. Doc. 47 at ¶¶ 34, 63; Doc. 58 at ¶ 20.

In early January 2019, Millis fell and fractured his left ulna. Doc. 47 at ¶ 42; Doc. 58 at ¶ 28. Three days later, Dr. Daniel Mass, an orthopedic surgeon, operated on Millis and installed an ulnar distal plate and screws. Doc. 58 at ¶ 29. In March 2019, Millis received a steroid injection from Dr. Mass to enable him to "cover the liver transplant service while everyone else was out on spring break with their famil[ies]." Doc. 47 at ¶ 51. The following week, while on call, Millis performed a liver transplant surgery. *Ibid.*

In September 2019, Millis requested a disability accommodation to his surgical practice from UChicago's disability accommodation department. *Id*. at ¶ 56. In support, Millis submitted a Certification of Health Care Provider form, signed by Dr. Mass, stating that although he could not be primarily responsible for liver transplant surgeries, he could serve as a first assistant on liver transplants and procurements, serve as the primary surgeon on non-transplant general and vascular surgery, and perform general surgeries, including liver resections, expected to last up to five hours. *Ibid.* In mid-October 2019, Millis was temporarily reassigned from his "responsibility to primarily perform liver transplant surgeries and liver procurements for transplants as the primary surgeon" to serving as a first assistant on liver transplants and procurements, as a "[p]rimary or first assistant for non-transplant surgical cases on transplant operations," and as a primary, co-surgeon, or assisting surgeon on non-transplant general and vascular surgeries, so long as those procedures took less than five hours. *Id*. at ¶ 58; Doc. 48-2 at 18-19. The accommodation was temporary, as Millis anticipated undergoing additional surgeries that might enable him to again perform liver transplants as the primary surgeon. Doc. 66 at 86.

In mid-November 2019, due to Millis's "chronic volar-ulnar pain," Dr. Mass performed a second surgery to remove the ulnar plate.  Doc. 58 at ¶ 30.  Millis underwent a third surgery on March 19, 2020.  *Id*. at ¶ 31.

Despite undergoing those additional surgeries, Millis is still limited to performing surgeries that last less than five hours.  Doc. 47 at ¶ 65; Doc. 58 at ¶ 32.  Because liver transplant surgeries last more than five hours, he can no longer perform them.  Doc. 47 at ¶¶ 65, 127.  Other than the March 2019 liver transplant surgery, Millis has not performed any liver transplant surgeries since his injury.  Doc. 58 at ¶ 35.  In 2020, he performed over 100 hepatobiliary surgeries.  Doc. 47 at ¶ 63.

In late August 2020, UChicago Medicine sent Millis an accommodation letter stating that he was "no longer able to perform the essential functions of [his] job as a transplant surgeon that primarily performs abdominal transplant surgeries" and permanently reassigning him from his role as a liver transplant surgeon in the Section of Transplant Surgery to that as a general surgeon in the Section of General Surgery.  *Id*. at ¶ 61; Doc. 58 at ¶¶ 36-37; Doc. 51-11 at 3.  After his reassignment, Millis no longer performed liver transplant surgeries or procurements as either a primary or assisting surgeon.  Doc. 58 at ¶ 40.

Before his reassignment, Millis's salary consisted of a basic academic salary of $90,000, a term salary of $304,325, and an administrative supplement of $10,000.  *Id*. at ¶ 24.  After the reassignment, Millis's term salary was reduced to $150,000.  *Id*. at ¶ 38.  In late February 2021, Millis's privilege status at UChicago Medicine was changed from "abdominal transplant surgeon" to "general surgery."  *Id*. at ¶¶ 21, 39.

B.     **Millis's Disability Insurance Policy**

Ameritas issued Millis a disability insurance policy in November 2014.  Doc. 47 at ¶ 6.

The policy provides a disability benefit of $15,000 per month (with three percent annual cost of

living increases) if Millis becomes "Totally Disabled," which the policy defines as follows:

> **Total Disability** or **Totally Disabled** means that, solely due to sickness or
> injury, you are not able to perform the material and substantial duties of your
> occupation.  Your occupation means the occupation or occupations that you
> were engaged in, based on the duties you were performing for wage or profit,
> at the time disability began. …
>
> If you are a physician or dentist and have limited your duties to the
> performance of the usual and customary functions of a specific, professionally
> recognized medical or dental specialty, we will consider that specialty your
> occupation.

Doc. 58 at ¶¶ 7-8.  The policy provides for a lower monthly benefit if Millis is only "Residually

Disabled," meaning that, "due to sickness or injury … you are able to perform one or more, but

not all, of the material and substantial duties of your occupation."  *Id*. at ¶ 9.

The policy imposes on Millis the "responsibility, at [his] expense, to submit to [Ameritas]

written proof of loss within 90 days after the date of loss," and allows Ameritas to "request

additional proof of loss as often as [it] deem[s] necessary."  Doc. 47 at ¶ 10.  In addition, the

policy imposes on Millis a "duty to cooperate with [Ameritas] concerning all matters relating to

this policy and any claims thereunder.  This cooperation includes but is not limited to submitting

all required forms and other documentation according to this policy's provisions."  *Id*. at ¶ 11.

C.     **Ameritas's Claim Review Process**

Jennifer Mueller, the Ameritas Lead Claims Examiner who handled Millis's claim,

testified at her deposition to her typical process for evaluating disability claims.  *Id*. at ¶¶ 16-17.

First, she reviews the insured's claim application, original insurance application, and the policy

language; next, she calls the insured to discuss the policy's benefits and the information that

Ameritas needs for its evaluation; after that, a field representative meets with the insured; and she then requests and reviews the insured's medical records. *Id*. at ¶ 17. Mueller then "would most likely" prepare a referral to Ameritas's medical director, Dr. Timothy Steffen, and, depending on Dr. Steffen's review, she might request an independent medical examination, a medical peer review, or an occupational review. *Id*. at ¶¶ 23-24.

Ameritas does not have a written guide for reviewing claims; rather, each claim is "reviewed on its own individual basis regarding the facts and information [] obtained," and decisions are made in "as fair and reasonable [a] manner as possible." *Id*. at ¶ 19; Doc. 66 at ¶ 74. Ameritas's "Fair Claims Practices: Illinois" document outlines the requirements for complying with Illinois's claim processing regulations, with which Mueller and her supervisor are required to be familiar. Doc. 47 at ¶¶ 18, 27; Doc. 66 at ¶ 74. In addition, under a specialty-occupation policy such as Millis's, Ameritas determines whether the insured's pre- and post-disability duties fall within a "professionally recognized specialty" by comparing "what [the insured] [was] doing before disability versus after disability." Doc. 47 at ¶¶ 20, 22, 30. Ameritas determines the insured's occupational duties by speaking with the insured and, for insureds in the medical profession, hiring outside experts to analyze the insured's Current Procedural Terminology ("CPT") codes. *Id*. at ¶¶ 30-31.

### D. Millis's Total Disability Benefits Claim

On May 11, 2019, Millis submitted a claim for total disability benefits to Ameritas, which it received on May 20. *Id*. at ¶ 43; Doc. 58 at ¶ 41. Millis's submission described his January 2019 injury and surgery and stated that he was able to perform "all [work] activities except performing liver transplants, just not able to perform liver transplants without a steroid injection." Doc. 47 at ¶¶ 44, 47. Millis added that he "was able to perform 1 liver transplant when all the other liver transplant surgeons were out of town." *Id*. at ¶ 46. An "Attending

Physician's Statement for Disability Benefits" form completed by Dr. Mass stated that Millis could not perform "[l]iver transplants if he has not had a recent steroid injection," *id*. at ¶ 48.

On June 6, Mueller sent Millis a letter requesting the following documentation: current and prior monthly earnings; federal income tax returns; monthly CPT codes from July 1, 2018 to the present; and medical authorizations. *Id*. at ¶¶ 16, 53, 70. On June 18, Mueller spoke with Millis, who described his injury and job limitations. *Id*. at ¶ 54. On July 2, Scott Young interviewed Millis on behalf of Ameritas and prepared a field report describing Millis's injury, treatment, and job duties, and noting that he had performed a liver transplant surgery in March 2019. *Id*. at ¶ 55.

On July 8, Mueller sent Millis a letter repeating her June 6 documentation request. *Id*. at ¶ 71. On August 6, Millis's counsel asked Mueller to direct future correspondence to him. *Id*. at ¶ 72. Two days later, Mueller asked Millis's counsel for the documents she had sought from Millis on June 6 and July 8. *Id*. at ¶ 73. Later that month, Millis's counsel provided Mueller with all the requested documentation, except for his monthly CPT codes. *Id*. at ¶ 74. On September 6, Mueller again asked for Millis's CPT codes, as well as for his earnings from July through August 2019 and documentation of his work-related travel. *Id*. at ¶ 75. Millis's counsel provided the requested earnings documentation on September 25, and provided CPT codes for Millis's surgical procedures on October 10. *Id*. at ¶¶ 77-80, 109.

On September 12, Dr. Steffen, Ameritas's medical director, conducted an initial review of Millis's total disability benefits claim and determined that it was "unclear" whether he could currently perform liver transplant surgeries, given that he successfully performed one in March 2019 after receiving a steroid injection. *Id*. at ¶ 89; Doc. 48-2 at 45. On November 22, Mueller informed Millis that the documentation he had submitted to date allowed Ameritas to determine

his disability only through March 2019, and she requested additional information—including updated medical records, CPT codes from October 2019, monthly earnings from September and October 2019, and work-related travel records—in order to determine the extent of his disability after March 2019. Doc. 47 at ¶ 81. Mueller also asked Millis to undergo an independent medical examination. *Ibid*. On December 19, Mueller sent Millis's counsel a letter repeating her November 22 document request. *Id*. at ¶ 82. On December 30, Millis's counsel asked that the medical examination be postponed and provided updated medical records, but he did not provide Millis's updated CPT codes or monthly earnings. *Id*. at ¶¶ 83-84.

On March 9, 2020, Millis underwent an independent medical examination conducted by Dr. Craig Phillips. *Id*. at ¶ 91. Dr. Phillips concluded that Millis still had wrist pain precluding him from performing liver transplant surgeries and opined that his "prognosis if he undergoes surgery is fair at best." *Id*. at ¶¶ 92-93. (As noted, Millis underwent another surgery on March 19. Doc. 58 at ¶ 31.) Dr. Steffen reviewed Dr. Phillips's report and determined that Ameritas needed additional information on the non-liver transplant surgeries that Millis performed before his injury, as well as on his current duties as a liver transplant surgeon that did not involve performing liver transplants. *Id*. at ¶ 94; Doc. 48-2 at 59-60.

On April 20, 2020, Mueller requested Millis's *complete* CPT codes, including office visits, from July 2018 to the present, monthly earnings from September 2019 to the present, and work-related travel records. Doc. 47 at ¶ 100. Mueller repeated that same request, to no avail, on May 21 and July 20. *Id*. at ¶¶ 101-103.

On July 16, Mueller retained Edwin Warner to analyze Millis's incomplete CPT codes. *Id*. at ¶¶ 105-106. That day, Warner told Mueller that Millis's codes were "n[o]t useable," as they were limited only to his surgical procedures and were unlabeled. *Id*. at ¶¶ 108-109.

On September 2, Mueller wrote to Millis's counsel repeating her April 20 document request for the third time and informing him that, if the documents were not provided, Ameritas would assume that Millis was no longer interested in pursuing his claim. *Id*. at ¶ 112. On October 5, Millis's counsel responded that Ameritas "was given everything it needs to approve total disability benefits," and he submitted several letters from UChicago Medicine demonstrating that Millis had been permanently reassigned to the General Surgery section as of October 1. *Id*. at ¶ 113.

At some point after November 11, 2020, as part of written discovery in this case, Millis produced a complete set of his CPT codes. *Id*. at ¶ 117. Mueller sent the complete set to Warner on March 11, 2021 for his analysis, and Warner submitted his report to Mueller three days later. *Id*. at ¶¶ 117-118. On March 17, Ameritas received a financial review of Millis's income from CPA Judy Bogdonavich. *Id*. at ¶ 119.

Mueller then drafted a claim decision letter, which Dr. Steffen and Ameritas's Claims Manager, Jon Erdman, reviewed. *Id*. at ¶ 25, 123-125. Dr. Steffen noted that Millis's CPT codes showed that he was performing complex hepatobiliary surgeries; that his curriculum vitae identified him as the director of hepatobiliary surgery at UChicago Medicine and as performing over 100 hepatobiliary surgeries in 2020; and that there was "no appearance that he has restricted himself specifically and only to liver transplants." *Id*. at ¶ 123. Erdman similarly concluded that, based on his CPT codes and CV, Millis had not limited his pre-injury duties to that of a liver transplant surgeon and presently was doing "almost everything that he was doing pre-disability besides the long liver transplant surgeries." *Id*. at ¶¶ 124-125.

On April 23, 2021, Ameritas issued a decision granting Millis residual disability benefits for 2019, and requesting updated CPT codes in order to determine his total disability and 2020

residual disability claims. *Id*. at ¶ 122; Doc. 48-2 at 84-92. On July 8, Mueller again requested Millis's updated CPT codes and monthly earnings documentation. Doc. 47 at ¶ 129. On September 9, 2021, Ameritas granted Millis's residual disability benefits claim for 2020 and denied his total disability claim. *Id*. at ¶ 130.

      E.    **Hepatobiliary and Liver Transplant Surgery**

Hepatobiliary surgery and liver transplant surgery are separate specialties. *Id*. at ¶ 67. Dr. Jeffrey Matthews, the Chief of UChicago Medicine's Surgery Department, testified at his deposition that "[s]ome transplant surgeons do hepatobiliary surgery and some general surgeons and surgical oncologists do hepatobiliary surgery, but general surgeons don't do liver transplant surgery. And there are many hepatobiliary surgeons who don't do liver transplant surgery." *Id*. at ¶¶ 66-67; Doc. 48-1 at 142. Dr. Matthews testified further that Millis was "formerly a transplant surgeon who has the advanced training in hepatobiliary surgery that one would have through being previously a transplant surgeon." Doc. 66 at ¶ 79; Doc. 48-1 at 142. Dr. Matthews explained that a hepatobiliary surgeon operates on the liver and bile ducts with a degree of specialty that a general surgeon would not have without advanced training. Doc. 47 at ¶ 68. He added that a hepatobiliary surgeon does not need to be certified as a liver transplant surgeon. *Id*. at ¶ 37.

Liver transplant surgery is a professionally recognized medical specialty. Doc. 58 at ¶ 27. The American Society of Transplant Surgeons ("ASTS") transplant fellowship training certification requires that a liver transplant surgical candidate perform a minimum of 45 liver transplants and a minimum number of other surgeries, which can include hepatobiliary surgeries. Doc. 66 at ¶ 61.

Adult liver transplant programs in the United States generally employ between two and five transplant surgeons, and 95% of those programs perform fewer than 100 liver transplants per

year. *Id*. at ¶ 66. Approximately half of the liver transplant surgeon respondents to a 2017 ASTS survey reported performing between eleven and thirty transplants annually, and a majority of respondents reported performing liver transplant surgeries only once per week to once per month, on average. *Ibid*.

Dr. David Reich, a transplant surgeon whom Millis retained as an expert, states in his expert report that "liver transplant surgeons may also transplant other types of organs, or perform HPB [hepatobiliary] or other types of general surgery," as part of their practice. Doc. 58 at ¶ 56. Dr. Reich's report explains that "the usual and customary function of an FTE [full time employed] liver transplant surgeon is to perform a handful of liver transplant surgeries every few months, on average, at a hospital that generally has 2-5 liver transplant surgeons supporting a liver transplant program with a volume of fewer than 100 liver transplants annually. A liver transplant surgeon customarily performs other duties besides liver transplant surgeries. At a university teaching hospital, it is common for a surgeon to also have an academic appointment." *Ibid*.; Doc. 51-29 at 8.

Vocational expert Ashley Johnson, another expert retained by Millis, concludes in her expert report that, before his injury, Millis "was performing his own occupation of liver transplant surgeon in the usual and customary way that it is generally performed." Doc. 58 at ¶ 55. Johnson bases this conclusion on her submission that liver transplant surgery "is a specialized occupation that exceeds the duties of a general surgeon, although general surgeries are often performed by liver transplant surgeons." Doc. 66 at ¶ 63; Doc. 51-28 at 11-12.

Vocational expert Mary Barros-Bailey, an expert retained by Ameritas, concludes in her expert report that, before his injury, Millis "was engaged in a composite job of two occupations": hepatobiliary surgery and liver transplant surgery. Doc. 48-2 at 110. Barros-Bailey bases this

conclusion on her submissions that "hepatobiliary surgery is an occupation in and of itself," which "can be accessed from a couple of avenues: transplant surgery with specialized training or general surgery with specialized training," and that "hepatobiliary surgeons are individual scopes of practice mainly within broader surgical specialties." *Id*. at 107-109.

Johnson, Barros-Bailey, and Dr. Reich agree that, in a university teaching hospital setting, a liver transplant surgeon's clinical practice generally includes the teaching of residents, nurses, and physician assistants. Doc. 66 at ¶¶ 64-65.

### Discussion

Millis claims that Ameritas wrongfully denied his claim for total disability benefits. Ameritas responds that Millis is not entitled to total disability benefits because, of his three pre-disability occupations—liver transplant surgeon, hepatobiliary surgeon, and professor of surgery—his injury prevents him from performing only one, liver transplant surgeon. Millis submits that he performed only one occupation before his injury—liver transplant surgeon—and that his present inability to perform liver transplant surgeries entitles him to total disability benefits. In addition, Millis claims that Ameritas's denial of benefits was "vexatious and unreasonable" under Section 155.

## I.    Total Disability Coverage

The parties agree that Illinois law governs interpretation and application of the Ameritas policy. Doc. 46 at 6; Doc. 52 at 3. Under Illinois law, an insurance policy, like any contract, "is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). "[The court's] primary function is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1003 (Ill. 2010). "Although policy terms that limit

an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007) (quoting *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). "While [the court] will not strain to find an ambiguity where none exists, neither will [it] adopt an interpretation which rests on gossamer distinctions that the average person, for whom the policy is written, cannot be expected to understand." *Munoz*, 930 N.E.2d at 1004 (internal quotation marks and citation omitted).

As noted, Millis claims coverage under the policy's Total Disability provision, which applies if, "solely due to sickness or injury," the insured is "not able to perform the material and substantial duties of [his] occupation." Doc. 58 at ¶ 7. If the insured is a physician and has "limited [his] duties to the performance of the usual and customary functions of a specific, professionally recognized medical … specialty," the policy "consider[s] that specialty [to be the insured's] occupation." *Ibid*. Otherwise, the policy defines the insured's occupation as "the occupation or occupations that [the insured] [was] engaged in, based on the duties [he] [was] performing for wage or profit, at the time disability began." *Ibid*.

The parties agree that Millis is a physician, that liver transplant surgery is a professionally recognized medical specialty, and that he can no longer perform liver transplant surgeries. Doc. 46 at 1, 6; Doc. 52 at 1. That leaves two questions pertinent to whether Millis is entitled to total disability coverage. First, before his injury, did Millis limit his duties to the "usual and customary functions" of a liver transplant surgeon, such that his pre-injury "occupation" was solely that of a liver transplant surgeon? Second, and if so, does Millis's post-injury inability to perform liver transplant surgeries preclude him from performing the "material

and substantial duties" of being a liver transplant surgeon? Because the answer to both questions is "yes," Millis is entitled to total disability coverage.

### A. Usual and Customary Functions of a Liver Transplant Surgeon

Ameritas argues that, because Millis performed liver transplant surgeries and hepatobiliary surgeries before his injury, and also served as a Professor of Surgery, he did not limit himself to the "usual and customary functions" of a liver transplant surgeon, but rather practiced three separate "occupations": liver transplant surgeon, hepatobiliary surgeon, and professor. Doc. 46 at 6-12. As Ameritas sees things, that conclusion necessarily follows from the facts that Millis is an expert in hepatobiliary surgery and that hepatobiliary surgery "is not liver transplant surgery." *Id*. at 7-9.

Ameritas's logic is faulty. The critical question here is not whether hepatobiliary surgery and liver transplant surgery are separate specialties, but whether it is "usual and customary" for liver transplant surgeons to perform hepatobiliary surgeries as part of their liver transplant surgery practice. Ameritas offers no evidence on the scope of the "usual and customary" functions of a liver transplant surgeon. By contrast, Millis adduces competent evidence that it is standard for liver transplant surgeons to perform hepatobiliary surgeries.

Dr. Reich opines that "the usual and customary function of a[] [full-time employed] liver transplant surgeon is to perform a handful of liver transplant surgeries every few months" and to "perform[] other duties besides liver transplant surgeries," including "HPB [hepatobiliary] or other types of general surgery." Doc. 58 at ¶ 56; Doc. 51-29 at 8. Johnson likewise opines that "general surgeries are often performed by liver transplant surgeons." Doc. 66 at ¶ 63; Doc. 51-28 at 11-12. And Dr. Matthews testified that "[s]ome transplant surgeons do hepatobiliary surgery," adding that transplant surgeons receive "advanced training in hepatobiliary surgery." Doc. 47 at ¶ 67; Doc. 48-1 at 142. In fact, to complete a liver transplant

fellowship, a fellow must perform a minimum number of non-liver transplant surgeries, which can include hepatobiliary surgeries. Doc. 66 at ¶ 61. That liver transplant surgeons also perform other surgeries, including hepatobiliary surgeries, is further supported by the fact that, due to the small volume of liver transplant surgeries performed at adult liver transplant programs, most liver transplant surgeons perform liver transplant surgeries only once per week to once per month. *Id*. at ¶ 66. It follows that liver transplant surgeons *must* perform duties besides liver transplant surgeries for most of their working hours.

Barros-Bailey's expert report does not undermine these conclusions. To support her view that Millis practiced two separate occupations before his injury, liver transplant surgery and hepatobiliary surgery, Barros-Bailey opines that "hepatobiliary surgery is an occupation in and of itself" that can be "accessed through training and experience not only in liver transplant surgery, but other medical specialties" as well. Doc. 48-2 at 107, 110. That opinion is undisputed: hepatobiliary surgery can be practiced as its own occupation, and hepatobiliary surgeons do not have to be liver transplant surgeons. But it does not follow from that opinion that it is unusual for liver transplant surgeons to perform hepatobiliary surgeries as part of their liver transplant practice. To the contrary, Barros-Bailey's report *supports* Millis's position (that performing hepatobiliary surgeries is a "usual and customary" part of a liver transplant surgeon's practice) by characterizing some liver transplant surgeon position announcements as "specific to transplant surgeons with hepatobiliary specialty," *id*. at 107, by stating that "hepatobiliary surgeons are individual scopes of practice *mainly within broader surgical specialties*," *id*. at 109 (emphasis added), and by noting that expertise in hepatobiliary surgery can be "accessed through training and experience … in liver transplant surgery," *id*. at 110. Barros-Bailey's report thus

15

confirms Millis's submission that hepatobiliary surgery is frequently practiced by liver transplant surgeons, among other specialists.

Ameritas also contends that Millis did not limit himself to the "usual and customary functions" of a liver transplant surgeon because he also served as a Professor of Surgery, in which capacity he "train[ed] and [taught] students and physicians about liver transplants and the management of liver disease." Doc. 46 at 9; Doc. 47 at ¶ 38. That argument fails, as both sides' experts agree that, in a university teaching hospital setting, it is customary for a liver transplant surgeon's clinical practice to include the teaching of residents, nurses, and physician assistants. Doc. 66 at ¶¶ 64-65.

Because Ameritas offers no evidence that Millis's performance of hepatobiliary surgeries and professorial duties fell outside the scope of the "usual and customary functions" of a liver transplant surgeon, and because Millis offers competent evidence that performing those activities falls within the scope of that profession, a reasonable factfinder could conclude only that, before his injury, Millis "limited [his] duties to the performance of the usual and customary functions of" a liver transplant surgeon. Doc. 58 at ¶ 7. Accordingly, Millis's "occupation," for purposes of total disability coverage under Ameritas's policy, is that of a liver transplant surgeon, period.

**B.    Whether Millis Can Perform the Material and Substantial Duties of a Liver Transplant Surgeon**

As noted, Millis qualifies for total disability benefits under the policy's Total Disability provision if, due to his injury, he is "not able to perform the material and substantial duties" of a liver transplant surgeon. *Ibid*. An insured is "'totally disabled' such that he is 'unable to perform the material and substantial duties of [his] regular occupation' … whenever there is a substantial change in the responsibilities, terms or conditions of [the insured's] occupation." *McFarland v. Gen. Am. Life Ins. Co*., 149 F.3d 583, 584, 588 (7th Cir. 1998). An insured is *not*

16

rendered "ineligible for coverage" under a total disability provision "simply because he can perform several functions that are 'material and substantial.' Rather, coverage is present as long as the number of 'substantial and material' duties that cannot be performed precludes continuation of employment in the position held before the disability." *Id*. at 587. For instance, an insured who is "no longer able to perform an essential duty of his regular occupation, resulting in the loss of his position, [] would be 'totally disabled' … even if, in percentage terms, the disability affected an essential duty that comprised, for example, only 5% of the [insured's] overall duties." *Id*. at 587-88 (explaining that a shortstop no longer able to throw due to an injury, but still able to perform a shortstop's other "principal duties" of running, hitting, and catching, "would be totally disabled because he could no longer be employed as a shortstop").

Ameritas concedes that Millis, due to his wrist injury, is "unable to perform liver transplant surgery work." Doc. 56 at 1; *see also id*. at 7 ("Ameritas has already acknowledged [] that [Millis] worked as a liver transplant surgeon and that at some point after his injury in January 2019 he was unable to perform liver procurement and transplant surgeries."). Nor does Ameritas dispute that Millis was permanently reassigned from his role as a liver transplant surgeon in the Section of Transplant Surgery to that of a general surgeon in the Section of General Surgery because he was "no longer able to perform the essential functions of [his] job as a transplant surgeon that primarily performs abdominal transplant surgeries," and that the reassignment resulted in a $154,325 pay cut and the elimination of his privileges to perform abdominal transplant surgeries. Doc. 58 at ¶¶ 24, 36-39; Doc. 51-11 at 3. It indisputably follows that Millis cannot perform the "material and substantial duties" of his pre-disability occupation of liver transplant surgeon. *See McFarland*, 149 F.3d at 587-88 (holding that an insured cannot

17

perform the "material and substantial duties" of his occupation when he is "no longer able to perform an essential duty of his [] occupation, resulting in the loss of his position").

Millis accordingly is entitled to summary judgment on his total disability claim. Because Barros-Bailey's expert report does not undermine—and in fact is consistent with—this conclusion, Millis's motion to bar Barros-Bailey's expert testimony is denied as moot.

## II.    Section 155 Claim

Section 155 provides that when an insurer's denial of liability on a policy, dispute of the amount of loss payable, or delay in settling a claim "is vexatious and unreasonable," the court may allow the insured to recover attorney fees, other costs, and punitive damages. 215 ILCS 5/155(1). Section 155 establishes "an extracontractual remedy to policy-holders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1023 (7th Cir. 2013) (internal quotation marks omitted). "Because this statute is penal in nature[,] its provisions must be strictly construed." *Ibid.* (internal quotation marks omitted).

"An insurer's actions are not vexatious and unreasonable if (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law." *TKK USA, Inc. v. Safety Nat'l Cas. Corp.*, 727 F.3d 782, 793 (7th Cir. 2013) (internal quotation marks omitted). In short, "[i]f there is a bona fide dispute regarding coverage—meaning a dispute that is real, genuine, and not feigned—statutory sanctions under section 5/155 are inappropriate." *Phillips*, 714 F.3d at 1023 (alteration and internal quotation marks omitted). Statutory penalties under Section 155 "may not be awarded simply because an insurer takes an unsuccessful position in litigation, but only where the evidence shows that the insurer's behavior was willful and

without reasonable cause." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co*., 200 F.3d 1102, 1110 (7th Cir. 2000).

Millis argues that Ameritas's denial of his total disability claim was "vexatious and unreasonable" under Section 155 because it "failed to investigate the occupation of liver transplant surgeon," failed to make a timely claims decision, and "has no guidelines or standards for determining claims." Doc. 60 at 12. Even viewing the record in the light most favorable to Millis, his arguments have no merit.

True enough, Ameritas's reasoning in denying Millis's total disability claim—that, before his injury, he also practiced the separate occupation of hepatobiliary surgeon, a distinct specialty from liver transplant surgery—mistakenly failed to consider the critical question of whether it is "usual and customary" for liver transplant surgeons to perform hepatobiliary surgery. But a good-faith mistake does not warrant sanctions under Section 155, *see Phillips*, 714 F.3d at 1023; *Citizens First*, 200 F.3d at 1110, especially when the insurer "presented [its arguments] with reasoned support," *Med. Protective Co. v. Kim*, 507 F.3d 1076, 1087 (7th Cir. 2007). Ameritas's analysis was flawed, but it was based on the understandable (but mistaken) determinations of Mueller, Steffen, and Erdman that, because Millis performed complex hepatobiliary surgeries before his injury, he had not "restricted himself specifically and only to liver transplants." Doc. 47 at ¶¶ 123-125. Ameritas also invested significant resources in attempting to determine the extent of Millis's disability and the differences between his pre- and post-injury medical practices, including by retaining outside consultants to perform an independent medical examination, two analyses of his CPT codes, and a financial review of his income, and by diligently requesting documentation that Millis repeatedly failed to provide. Those efforts demonstrate that Ameritas neither "fail[ed] to adequately investigate a claim" nor "den[ied] []

the claim without adequate supporting evidence." *Emerson v. Am. Bankers Ins. Co. of Fla.*, 585 N.E.2d 1315, 1320 (Ill. App. 1992). As Millis presents no evidence that Ameritas evaluated his claim in bad faith, and all the evidence suggests that Ameritas's denial of coverage was based on a bona fide dispute, Ameritas's failure to correctly ascertain the "usual and customary functions" of a liver transplant surgeon does not support Section 155 liability. *See TKK USA*, 727 F.3d at 793 ("An insurer's actions are not vexatious and unreasonable if [] there is a bona fide dispute concerning the scope and application of insurance coverage … .") (internal quotation marks omitted).

Millis's contention that Ameritas "fail[ed] to approve or deny [his] claim within a reasonable time" fares no better. Doc. 60 at 13. Millis submitted his claim in May 2019, but as of March 2020, Millis himself "anticipated having additional surgeries on his wrist in hopes of being able to perform transplants as primary surgeon again." Doc. 66 at ¶ 86. Without knowing whether he would be able to perform liver transplant surgery, Ameritas could not have resolved his total disability claim. More importantly, both before and after March 2020, it was Millis's repeated failure to timely provide necessary documentation to Ameritas that stymied its efforts to investigate his claim. Ameritas first requested Millis's CPT codes in early June 2019, some two weeks after receiving his claim. Doc. 47 at ¶¶ 43, 70. Millis did not provide Ameritas with any CPT codes until October 2019, *id.* at ¶ 78, after Ameritas repeated its request three times, *id.* at ¶¶ 71, 73, 75. Likewise, Millis did not comply with Ameritas's November 2019, April 2020, May 2020, and June 2020 requests for his post-October 2019 CPT codes, and he provided those codes only as part of discovery in this case. Doc. 27; Doc. 47 at ¶¶ 81, 100-103, 117. Millis likewise never provided Ameritas with documentation of his work-related travel, which Ameritas requested three times beginning in September 2019. Doc. 47 at ¶¶ 75, 100, 112, 114.

Ameritas issued a decision granting Millis residual disability benefits for 2019 a little over one month after receiving Millis's complete CPT codes in discovery, in April 2021, *id*. at ¶¶ 117-118, 122, and it again requested updated CPT codes to determine Millis's total disability claim, *id*. at ¶ 122; Doc. 48-2 at 84-92. Ameritas repeated its request for updated CPT codes in July 2021, which Millis never provided, and it issued its final decision denying his total disability claim two months later, in September 2021. *Id*. at ¶¶ 129-130. Given Millis's refusal to provide Ameritas with the CPT codes it needed to determine his claim, and Ameritas's prompt action when it did receive the requested CPT codes, no reasonable jury could find that Ameritas's delay in determining Millis's total disability claim was "vexatious and unreasonable." *See Phillips*, 714 F.3d at 1023 (holding that an insured had "no conceivable claim" that her insurer "subject[ed] [her] to an unreasonable or vexatious delay" when the insured's actions caused the delay).

Last, Millis contends that Ameritas's coverage denial was unreasonable because its lack of a "written guide for claims review[s]" manifests a failure to "adopt and implement reasonable standards for the prompt investigations and settlement of claims arising under its policies," as required by Section 154.6(c) of the Illinois Insurance Code, 215 ILCS 5/154.6(c). Doc. 60 at 13. That contention is incorrect. In *O'Connor v. Country Mutual Insurance Co*., 999 N.E.2d 705 (Ill. App. 2013), the court held that claims reviewers who "did not use any manuals, written procedures, bulletins, leaflets or computer programs" to evaluate claims, but rather reviewed the insured's policy, relied on outside consultants, and "considered different criteria case-by-case," did not violate Section 154.6(c). *Id*. at 710. Specifically, the court held that the insurer established that it "employed a method for investigating and evaluating" claims through the

claims reviewers' explanations of "the steps they employed in valuing claims generally and [the plaintiff's] claim specifically." *Ibid*.

The same result obtains here. At her deposition, Mueller explained in detail the steps that she takes in evaluating disability claims, which include reviewing the claim application and policy, interviewing the insured, sending a field representative to interview the insured in person, and requesting and reviewing the insured's medical records. Doc. 47 at ¶ 17. Depending on the circumstances, Mueller might also refer the claim to Ameritas's medical director and request an independent medical examination, a medical peer review, or an occupational review. *Ibid*. For specialty-occupation policies like Millis's, Mueller testified without contradiction that Ameritas determines whether the insured's pre- and post-disability duties fall within a "professionally recognized specialty" by speaking with the insured and hiring an outside expert in CPT analysis to compare the insured's duties before and after the disability arose. *Id.* at ¶¶ 20, 22, 30-31. Mueller further testified that, although Ameritas does not have a written guide for claims reviews, each claim is "reviewed on its own individual basis regarding the facts and information [] obtained," and claims examiners are expected to be familiar with Illinois claim processing regulations outlined in a "Fair Claims Practices: Illinois" document. *Id.* at ¶¶ 18-19; Doc. 66 at ¶ 74.

Mueller's processing of Millis's claim demonstrates that she followed those steps. Mueller spoke with Millis about his injury and job performance limitations in mid-June 2019, and a field representative interviewed Millis in person in early July. Doc. 47 at ¶¶ 54-55. Mueller then requested Millis's medical records and CPT codes, referred the claim to Dr. Steffens, and requested an independent medical examination, and when she finally received Millis's CPT codes, she retained Dr. Warner to analyze them. *Id.* at ¶¶ 70, 81, 89, 105-106,

117-118. As in *O'Connor*, Mueller's explanation of "the steps [she] employed in [evaluat]ing claims generally and [Millis's] claim specifically" satisfies Section 154.6(c) despite Ameritas not having a written claims review manual. *O'Connor*, 999 N.E.2d at 710.

Accordingly, Ameritas is entitled to summary judgment on Millis's Section 155 claim.

## Conclusion

Ameritas's summary judgment motion is granted in part and denied in part. The motion is denied as to Millis's breach of contract claim for total disability coverage, and it is granted as to his Section 155 claim. Millis's motion for summary judgment on his breach of contract claim for total disability coverage is granted, and his motion to strike Barros-Bailey's expert report is denied as moot. With all claims resolved, judgment will be entered.

May 20, 2022

_____
United States District Judge